# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

|                        |     |                                         |
|------------------------|-----|-----------------------------------------|
| DALTON LISTER,         | )   |                                         |
|                        | )   | Case No. 1:16-cv-495                    |
| *Petitioner*,          | )   |                                         |
|                        | )   | Judge Travis R. McDonough               |
| v.                     | )   |                                         |
|                        | )   | Magistrate Judge Christopher H. Steger  |
| TAMMY FORD,            | )   |                                         |
|                        | )   |                                         |
| *Respondent*.          | )   |                                         |

## MEMORANDUM OPINION

Petitioner Dalton Lister, proceeding *pro se*, has filed a petition for a writ of habeas corpus under 28 U.S.C. §2254, challenging the constitutionality of his detainment pursuant to his Bradley County convictions for first-degree felony murder, two counts of attempted aggravated robbery, and conspiracy to commit aggravated robbery (Doc. 1). After reviewing the parties' filings and the relevant state court record, the Court has determined that Petitioner is not entitled to relief under §2254, and no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, R. 8(a); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 petition will be **DENIED**, and this matter will be **DISMISSED**.

## I. BACKGROUND

On February 16, 2005, a Bradley County Grand Jury indicted Petitioner for first-degree felony murder of Julius "K.C." Shapley, two counts of attempted aggravated robbery of Beto Villalobos and Mr. Shapley, respectively, and conspiracy to commit aggravated robbery of the same, all arising from a set of events occurring on December 22, 2004. (Doc. 15-1, at 5–7.) Petitioner was tried along with co-defendants Tony Kincaid and Heather Massengill, while co-

defendant Richard Jerger's trial was severed because he testified for the prosecution. *State v. Lister* ("*Lister I*"), No. E2007-00524-CCA-MR3-CD, 2009 Tenn. Crim. App. LEXIS 494, at *2–*3 (Tenn. Crim. App. June 29, 2009).

The evidence adduced at trial demonstrated that prior to these events, Petitioner worked for a roofing company owned by Scott Parker and Mr. Jerger. *Id.* at *3. At trial, Mr. Parker testified that shortly before Christmas, Petitioner asked him to "go with him to do a robbery" because some people he knew from Texas were coming to Cleveland and would have money and drugs. *Id.* Mr. Parker refused and terminated Petitioner's employment the same day. *Id.* at *3–*4.

Michelle Bunting Teffeteller, who was a prostitute at the time, testified that the day before the shooting, on December 21, 2004, she was with Ms. Massengill at Ms. Massengill's mother's house. *Id.* at *30. Ms. Massengill received a phone call that she believed was from Mr. Villalobos or Mr. Shapley and became very anxious. *Id.* Ms. Massengill then called Petitioner, whom she was dating and with whom she lived, and he also became very anxious. *Id.* at *30–*31. Afterwards, Ms. Teffeteller went to Petitioner and Ms. Massengill's home and they all "talked about K.C., Beto, and a feud that began the year before." *Id.* at *31. Ms. Teffeteller testified that the group also talked about retaliation and a possible robbery, and Petitioner and Ms. Massengill began making calls to attempt to organize the robbery.[1] *Id.*

Mr. Jerger, a co-defendant, testified that this same day, the day before the shooting, Petitioner and Ms. Massengill picked him up from his home and told him about the plan to rob the victims for either marijuana or money. *Id.* at *37. The couple asked him to go to the Classic

---

[1] Co-defendant Jerger's testimony differed on this point, in that he also implicated Ms. Teffeteller as making calls to recruit others to join in the robbery. *Lister I*, at *38.

Suites Hotel to look for vehicles with Texas license plates and report to them. *Id.* Mr. Jerger did

so and then called alerting them that he had found two vehicles with Texas license plates. *Id.* at

*37–*38. Afterwards, the three of them went to Petitioner's home and began planning for Mr.

Jerger and another undetermined person to go to Mr. Shapley and Mr. Villalobo's hotel room

with guns. *Id.* at *38. According to Mr. Jerger, when they could not find access to guns or

another person to aid in the robbery, they gave up on the idea. *Id.*

However, Mr. Jerger testified that the following day, he and Petitioner "ran errands" and

then went to Jerry Kincaid's house, where they continued to talk about the robbery. *Id.* Jerry

Kincaid, who had been contacted the previous day as a potential second, reiterated to the men

that he believed this was a bad plan. *Id.* However, Tony Kincaid, Jerry's[2] cousin who was

present during these discussions, decided he would join in the plan. *Id.* Mr. Jerger claimed that

he asked Jerry for guns and while Jerry told him no, he did supply a .380 pistol to Tony,[3]

although Mr. Jerger conceded that he did not see Jerry hand Tony the gun. *Id.* at *39. Mr.

Jerger, Petitioner, and Tony Kincaid then left and went to a trailer, where Tony obtained a

second gun, which Mr. Jerger identified as a revolver in a camouflage case. *Id.* Next, they went

to Petitioner's home, where they met up with Ms. Massengill and Ms. Teffeteller. *Id.*

Ms. Teffeteller testified that, earlier that day, Ms. Massengill had come to her home and

asked if she wanted a client and she had accepted. *Id.* at *31. Ms. Teffeteller and Ms.

Massengill then returned to Petitioner and Ms. Massengill's home to get ready for her

appointment. *Id.* All four co-defendants—Petitioner, Mr. Jerger, Tony Kincaid, and Ms.

Massengill—were present at the house. *Id.* After Ms. Teffeteller got ready, she and Ms.

---

[2] The Court uses first names for clarity.

[3] Jerry Kincaid testified that the guns used in the commission of this crime did not belong to him
or to Tony and that he did not, in fact, see Tony with a gun. *Lister I*, at *46.

Massengill left to meet Mr. Shapley, who was to be Ms. Teffeteller's client, but they stopped at Wal-Mart to buy bullets first. *Id*. at *32.

Confirming this testimony, officers obtained video surveillance of a Wal-Mart sporting goods department from the night of December 22, 2004. *Id.* at *4. Janice Rezeppa, the Wal-Mart employee working in the sporting goods department that evening, testified that a "younger girl," whom she identified in court as being Ms. Massengill, came to purchase .380 ammunition. *Id.* After Ms. Rezeppa explained the differences in types of ammunition, Ms. Massengill purchased "jacketed hollow point" bullets, which were a type typically used for home protection. *Id.* Ms. Teffeteller testified that when she and Ms. Massengill returned to the parking lot, she asked Ms. Massengill about her safety during the appointment and Ms. Massengill told her to "listen to Petitioner." *Id.* at *32. Ms. Teffeteller then left with Mr. Shapley and went to his hotel room. *Id.* According to Mr. Jerger, Ms. Massengill then returned to her residence with the bullets and set them on the table. *Id.* at *39. Petitioner then took them to Tony Kincaid, who loaded the guns. *Id.*

Mr. Jerger said that he, Petitioner, and Tony then left the house with the two guns. *Id.* He averred that Petitioner bit off the end of a potato and put it on the end of one gun barrel, intending it to work as a silencer. *Id.* at *39–*40. The men drove to the Classic Suites Hotel and parked behind a dumpster. *Id.* at *40. Mr. Jerger testified that he stayed inside the parked car because he was "out of it," but Petitioner and Tony went towards the hotel. *Id.* He claimed that, while waiting in the car, he heard a commotion inside the hotel but did not hear any gunshots. *Id.*

Mr. Villalobos, the surviving victim in this case, testified that he and Mr. Shapley, one of his best friends, had come to Cleveland around Christmastime both for enjoyment and to collect

some money owed to them.  *Id.* at *12–*13.  The men were staying in the Classic Suites Hotel with two friends.  *Id.* at *12.  Mr. Villalobos admitted that he was a drug dealer[4] and that the money he was planning to collect was related to his drug trade.  *Id.* at *13.  He likewise admitted that Petitioner owed him money[5]; however, he claimed that he had taken no steps to recover any money while in Cleveland.  *Id.*

Mr. Villalobos said he had slept for most of the day at the hotel and when he awoke around 9:00 or 9:30 p.m., he found that Mr. Shapley was with a woman in the living room.  *Id.* at *14.  Mr. Villalobos left to get a meal from a nearby fast-food restaurant and returned to the hotel to eat it.  *Id.*  Although he originally intended to eat in the bedroom to give the pair privacy, he instead joined them in the living room to watch television and "smoke a joint."  *Id.* at *14–*15.

Mr. Villallobos testified that he heard someone at the back door of the hotel and that when he opened it, he saw Petitioner, who asked if "Michelle" was there.  *Id.* at *15.  Mr. Villalobos told Petitioner she was and then relocked the door.  *Id.*  Ms. Teffeteller then began gathering her things, but "froze" when the door was opened[6]; Mr. Villalobos testified that Petitioner's body language indicated he was ready to fight, so Mr. Villalobos took his jewelry off to fight Petitioner and called to Mr. Shapley.  *Id.*  According to Mr. Villalobos, Petitioner walked

---

[4] At the time of trial, Mr. Villalobos was in jail for possession of marijuana, possession of cocaine, and possession of a firearm.  *Lister I*, at *14.

[5] At one point, Mr. Villalobos said that Petitioner owed him and Mr. Shapley each $1,500, but later he said that Petitioner owed $6,000.  *Id.* at *13, *20.

[6] Ms. Teffeteller testified that she did leave the room and that, when she did, Ms. Massengill was not waiting for her as planned.  She said that she heard sounds of wrestling, Petitioner say, "I don't want to shoot you," followed by noise, and then silence. When she saw Petitioner and Tony Kincaid run out of the room, she ran with them back to the car because she did not know where else to go.  *Id.* at *32–*33.

in the room with his gun drawn and said, "Give it up, give it up. You all mother------s think I robbed you before. I'm gonna really rob you now. Where's the s--- at? Where's the money at? Give it up." *Id.* at \*15–\*16. At that point, co-defendant Kincaid came in the room holding a gun with a potato stuck on the end. *Id.* at \*16. The men all yelled at each other and Kincaid said, "Don't make me kill you . . . ." *Id.* Mr. Villalobos opened the front door of the hotel, hoping the hotel owner would see what was going on because he was "scared for his life." *Id.* However, Petitioner shut the door and told Mr. Villalobos that he would kill him if he opened the door again. *Id.*

Mr. Villalobos testified that Petitioner then told Tony not to shoot "K.C." but to shoot "the Mexican." *Id.* Mr. Villalobos and Mr. Shapley looked at each other and then Mr. Villalobos "rushed" Petitioner and Mr. Shapley and Tony Kincaid simultaneously began to fight. *Id.* While Mr. Villalobos and Petitioner were fighting, Mr. Villalobos heard a gunshot and Petitioner said, "We just came to scare you. . . . I wasn't gonna hurt nobody." *Id.* at \*17. Mr. Villalobos chased Petitioner out the back door, opened the front door, and then saw Tony Kincaid sliding out from under Mr. Shapley. *Id.* Tony ran out the back door and Mr. Shapley fell from the bed and lifted up his shirt to show that he had been shot. *Id.* When the hotel office called due to the noise, Mr. Villalobos asked them to send an ambulance, and they connected him to 9-1-1. *Id.* at \*17–\*18. Mr. Shapley later died from his injuries. *Id.* at \*5.

Three hotel guests testified about the events. Gary Webb, one of the hotel guests, testified that a "couple" of men, whom he identified at trial as Petitioner and co-defendant Kincaid, banged on the front and back doors of his hotel room "several" times and asked for "Michelle." *Id.* at \*11. He identified the "heavier-set man" as the "talker" and described him as

agitated, while the other man, whom he described as lighter-skinned, was more apologetic. *Id.* at *11–*12. He did not report hearing any gunshots. *Id.* at *12.

Two other hotel guests, David Rigsby and his wife Rhonda Rigsby, testified. The Rigsbys arrived at the Classic Suites Hotel the evening of the shooting and rented the room next door to the one rented by Mr. Shapley and Mr. Villalobos. *Id.* at *46. Mr. Rigsby reported seeing a Hispanic man leave that hotel room and a larger African American man stand in the doorway. *Id.* at *47. The African American man said, "Come back in the room. We'll settle it like men." *Id.* He saw the Hispanic man return to the room. *Id.* He also said he saw two other men a few doors down, but they had disappeared by the time he turned back around after retrieving things from his car. *Id.* Mr. Rigsby testified that, a few minutes later, at approximately 10:00 p.m., he and his wife heard a "fracas" in the room next door and noticed the walls shaking. *Id.* His wife went to the front office to inquire about another room. *Id.* Mrs. Rigsby confirmed hearing the commotion and said that she saw a woman being shooed away from the front door of the hotel room. *Id.* at *48. Mrs. Rigsby said the woman approached her in the parking lot and asked if she knew where a gas station was. *Id.*

Mr. Jerger claimed that Petitioner and Tony Kincaid, along with Ms. Teffeteller, came back to the car and got in and that Petitioner stated, "Tony shot K.C.," but clarified that Mr. Shapley was still talking when they left, so he was not sure whether Mr. Shapley had died. *Id.* at *40–*41. The group then drove back towards Tony's brother's trailer where Petitioner gave the guns to Tony, who was supposed to take them back to Jerry Kincaid. *Id.* at *41. On the way, Petitioner's car broke down[7] and the group walked home. *Id.* Mr. Jerger testified that he

---

[7] Bradley County Sheriff's Lieutenant John Collins confirmed that, on December 23, 2004, he found an abandoned vehicle, which had no registration information, but did have a tag inside

disposed of Tony's wallet, a bag with the box of bullets in it, and the name tag from the coveralls Tony had worn. *Id.*

Officer Kevin Felton testified that he collected and preserved evidence from the crime scene. *Id.* at *20. He collected one .380 and one .44 caliber handgun, found in the engine compartment of a car after Tony Kincaid told officers where to look, along with a pair of blue coveralls Tony was wearing during the shooting. *Id.* at *20–*21. Officer Felton and other officers also recovered a bloody red shirt and a box of .380 ammunition after Mr. Jerger took them to the location where he had disposed of the bullets. *Id.* at *21, 24. Officer Felton also took Tony Kincaid's statement and testified regarding the contents of that statement. *Id.* at *23. Officer Felton testified that Tony indicated he had obtained a black revolver from his cousin Mitchell's house, went to the hotel room to "get the prostitute," and did not recognize the African American man who answered the door. *Id.* According to Tony, the man who opened the door punched him, they fought, and the man began to choke him. *Id.* at *24. They struggled over the gun and Tony shot the man because he could not breathe. *Id.* Tony said he did not know about a plan to harm anyone. *Id.*

Officer Felton also testified as to Mr. Jerger's multiple statements. Officer Felton indicated that Mr. Jerger gave three statements. *Id.* at *25. In the first statement, he did not admit to anything. *Id.* In the second, he did not mention a plan to commit an armed robbery. *Id.* at *25–*26. During Mr. Jerger's third statement, following a later arrest, Officer Felton said that "Jerger was concerned about his possible parole violation, and [that] [Officer Felton] told him that the officers would tell his parole officer that he had been cooperative with them." *Id.* at *26.

---

"bearing the name Dalton Lister," which he remembered from the list of names of possible suspects in the previous night's shooting. *Lister I*, at *43–*44.

Officer Felton testified that it was not until this third statement that Mr. Jerger admitted that there had been a plan to rob the victims. *Id.*

On August 12, 2005, a Bradley County jury convicted Petitioner of first-degree felony murder, both counts of attempted aggravated robbery, and conspiracy to commit aggravated robbery. (Doc. 15-10, at 1147–48; Doc. 15-1, at 136, 146, 150, 154.) Petitioner was sentenced to, effectively, life in prison on April 12, 2006. (Doc. 15-1, at 56–59.) Petitioner filed his first motion for a new trial on May 17, 2006, and his second motion for a new trial on October 11, 2006. (*Id.* at 67–68, 70–73.) After a hearing, the court denied Petitioner's motions. (*Id.* at 75–78.) Petitioner then filed a direct appeal[8] to the Tennessee Court of Criminal Appeals ("TCCA"), where he raised four issues, asserting that: (1) the trial court erred by limiting the cross-examination of co-defendant Jerger regarding his criminal record, (2) the trial court erred by failing to suppress a recorded statement of Petitioner where the "original recording" of that statement, along with other recorded witness statements, was destroyed, (3) the trial court erred by not ordering the production of a statement made by the detective who destroyed the recordings, and (4) the evidence was insufficient to convict Petitioner of any of the offenses charged. (Doc. 15-13.) The TCCA determined that, because both of Petitioner's motions for new trial were untimely,[9] all of his issues were waived except for his challenge to the sufficiency of the evidence. *Lister I*, at *49. The TCCA then determined that the evidence was sufficient to support Petitioner's convictions. *Id.* at *52–55. Petitioner filed an application for permission to

---

[8] Petitioner did not file a timely notice of appeal, but rather filed a motion for the court to authorize a late-filed appeal, which the court granted. (Doc. 15-1, at 64.)

[9] The judgment against Petitioner was entered April 12, 2006, and Petitioner's first motion for new trial was filed on May 17, 2006, and was, therefore not timely under Tennessee Rule of Criminal Procedure 33(b), which requires that motions for new trial be filed within thirty days. *Lister I*, at *49.

appeal this decision to the Tennessee Supreme Court ("TSC") (Doc. 15-16), which the TSC denied (Doc. 15-17).

Petitioner then filed a state-court petition for post-conviction relief, (1) challenging the sufficiency of the evidence, (2) alleging that the trial court erred by delivering infirm jury instructions and limiting cross-examination of Richard Jerger, (3) challenging the state's destruction of the recording of Petitioner's statements, statements made during closing arguments, and late notice of its intent to seek enhanced punishment, and (4) raising many grounds of ineffective assistance of counsel.  (Doc. 15-18.)  The post-conviction court granted this petition in part, to the extent that it allowed Petitioner a "delayed direct appeal," on account of trial counsel's failure to file a timely motion for a new trial.  (Docs. 15-19, 15-20.)[10]  The court ordered Petitioner to file a motion for a new trial within thirty days.  (Doc. 15-20.)

Petitioner complied by filing a renewed motion for a new trial on September 2, 2011 (Doc. 15-21), which the trial court denied after a hearing (*id.* at 5; Doc. 15-22, at 10–11). Petitioner then filed a new direct appeal raising four issues to the TCCA:  (1) that the trial court erred by failing to suppress Petitioner's recorded statement when the original tape of that statement was destroyed, (2) that the trial court erred in allowing the testimony of Richard Jerger when he was only added to the witness list immediately before trial and erred in limiting cross-examination of this witness, (3) that the trial court erred in failing to provide defense counsel a statement made by Detective Kevin Felton regarding the destruction of the witness statements, and (4) that the evidence was insufficient to convict Petitioner because the verdicts were

---

[10] The trial court cited to *State v. Wallace*, 121 S.W.3d 652, 659 (Tenn. 2003) to find that Petitioner was entitled to relief for counsel's failure to properly appeal and Tennessee Code Annotated § 40-30-113 to find that a delayed appeal was the appropriate relief for this violation. (Doc. 15-19.)

inconsistent amongst co-defendants.  (Doc. 15-23.)  The TCCA affirmed Petitioner's conviction. *State v. Lister* ("*Lister II*"), No. E2012-00213-CCA-R3-CD, 2013 Tenn. Crim. App., LEXIS 595, at *1 (Tenn. Crim. App. July 12, 2013).  Petitioner again applied for permission to appeal to the TSC (Doc. 15-26), and permission was denied (Doc. 15-27).

Next, Petitioner filed a new post-conviction petition, asserting four claims of prosecutorial misconduct, twenty-four claims of ineffective assistance of counsel, a claim that there was a fatal variance between the indictment and the verdict against him, and a claim that the cumulative effect of all errors rendered his trial constitutionally infirm.  (Doc. 15-28, at 3–61.)  Following the appointment of counsel, counsel filed "Petitioner Dalton Lister's Listing of Issues to be Pursued Pursuant to His Post-Conviction Petition," in which he indicated an intent to omit some of Petitioner's raised issues and noted that he would specifically pursue (1) the prosecution's knowing presentation of false testimony, (2) prosecutorial misconduct for the willful destruction of evidence, and (3) the cumulative effect of the errors in Petitioner's trial. (*Id.* at 107–10.)  After an evidentiary hearing, post-conviction relief was denied.  (Doc. 15-29, at 2–29.)  Petitioner appealed the denial of his post-conviction petition, holding out that the post-conviction trial court erred in finding that the cumulative effect of the State's errors did not deny Petitioner a constitutionally fair trial.  (Doc. 15-32.)  The TCCA affirmed the dismissal of his petition.  *Lister v. State* ("*Lister III*"), No. E2015-01325-CCA-R3-PC, 2016 Tenn. Crim. App. LEXIS 315, at *1 (Tenn. Crim. App. Apr. 26, 2016).  Petitioner filed a final application for permission to appeal to the TSC (Doc. 15-35), which was denied (Doc. 15-36).

Finally, Petitioner filed the instant petition for a writ of habeas corpus (Doc. 1).  He originally filed his petition in the Western District of Tennessee, but it was transferred to this district pursuant to 28 U.S.C. §2241(d) (Doc. 5).  After Respondent filed her response (Doc. 16),

Petitioner filed a reply along with a "Motion for Leave of Court to Present Unexhausted Claims Pursuant to Martinez v. Ryan" (Doc. 17). Petitioner's motion specifically requested permission to raise claims to this Court, some related to ineffective assistance of counsel and some not, that he raised during state post-conviction proceedings but which were not included in his original post-conviction petition. (*Id.*)[11] The Court granted Petitioner's motion. (Doc. 19.) Afterwards, the Respondent filed a motion to file a supplemental brief addressing Petitioner's new claims (Doc. 21), which the court likewise granted (Doc. 23).

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, a district court may not grant habeas corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause where the state court decides a question of law or materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was an "objectively unreasonable," and

---

[11] Petitioner does not list his claims but rather incorporates by reference all issues "as outlined and argued in Petitioner's original post-conviction petition, in any amended post-conviction petition, and during his post-conviction hearing." (Doc. 17, at 18.)

not simply erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at

409–11. AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings

of fact, those findings are entitled to a presumption of correctness which may be rebutted only by

clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of

habeas relief is further restrained by exhaustion requirements and the doctrine of procedural

default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In order for

a claim to be considered on habeas review, the petitioner must first exhaust state remedies for

that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each

federal claim to all levels of the state appellate system, meaning he presented the "same claim

under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418

(6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's

claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at

842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of

presentation to the state's highest court. Tenn. S. Ct. R. 39.

If a claim has never been presented to the highest available state court and is now barred

from such presentation by a state procedural rule, that claim is procedurally defaulted and barred

from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural

default may also occur when a petitioner presented the claim to the highest court but the state

court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed

to comply with an applicable state procedural rule, which is regularly enforced and is an

"adequate and independent" state ground. *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th

Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

A claim that has been procedurally defaulted may be considered on its "merits only if the petitioner establishes cause for his failure to comply with the state procedural rule and actual prejudice from the alleged violation of federal law" or "demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); s*ee also House v. Bell*, 547 U.S. 518, 536 (2006). To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. Where petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

## III. ANALYSIS

### A. Procedural Default

In Petitioner's original federal habeas petition, he raises five claims: (1) the trial court limited Petitioner's cross-examination of co-defendant Richard Jerger, in violation of various constitutional rights; (2) the trial court violated Petitioner's constitutional rights when it declined to suppress a recorded statement by Petitioner when a compact disc of that statement had been destroyed by the State; (3) the court violated the *Jencks Act* by not requiring the State to disclose a witness statement; (4) the evidence was insufficient to support his convictions; and (5) the cumulative effect of errors by the State rendered Petitioner's trial unconstitutional. In his "Motion to Present Unexhuasted Claims . . . ," Petitioner incorporates by reference all claims he raised in his state-court post-conviction proceedings, which includes more than twenty-four

claims of ineffective assistance of counsel and twelve claims not related to ineffective assistance of counsel.[12]  Petitioner has presented claims to the TCCA three times, once in his original direct appeal, once on his delayed direct appeal, and again when appealing the dismissal of his post-conviction petition.[13]  Of the claims in Petitioner's original habeas petition, claims (1) through (3) were raised in Petitioner's delayed direct appeal, claim (4) was raised and considered on his first direct appeal,[14] and claim (5) was raised in his post-conviction appeal.  Of the myriad of claims in Petitioner's state post-conviction briefs, only those that substantially overlap with or were identical to those raised in Petitioner's original federal post-conviction petition were presented to the TCCA.  As Tennessee remedies are now foreclosed to Petitioner, all non-presented claims are technically exhausted but procedurally defaulted.  *Engle*, 456 U.S. at 125-26 n.28 (1982).  In Petitioner's "Motion to Present Unexhausted Claims . . . ," he recognizes that the claims he presented only in his post-conviction petitions and not on appeal are procedurally

---

[12] Many of these claims are overlapping or repetitive.

[13] Absent his applications for permission to appeal to the TSC, Petitioner has not presented his claims to the TSC.  To the extent he attempts to argue that presentation to the TSC in this format suffices, the Court notes that this presentation does not satisfy exhaustion requirements.  *See Olson v. Little*, 604 F. App'x 387, 402 (6th Cir. 2015) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)) (holding that presentation of a claim "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, [does not] constitute fair presentation.").

[14] Claims (1) through (4) were raised in both Petitioner's direct appeal and delayed direct appeal.  However, on direct appeal, the TCCA ruled that, as Petitioner had not timely filed a motion for new trial, the only issue it could consider was the sufficiency of the evidence.  On Petitioner's delayed direct appeal, the TCCA ruled that it could only reconsider the sufficiency of the evidence issue if "(1) the evidence offered on remand 'was substantially different' from the evidence in the initial proceeding; (2) the prior ruling was 'clearly erroneous' and allowing it to stand would constitute 'a manifest injustice'; or (3) the prior ruling is contrary to a change in the controlling law which occurred between the first and second appeal."  *Lister II* (citing *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003)).  The court found that Petitioner failed to establish any such circumstances and thus found "that this issue is devoid of merit."  Without their successful presentation in other contexts, these issues would have rendered the claims procedurally defaulted; however, they were successfully presented in other contexts.

defaulted. However, he posits that counsel's ineffective assistance in deciding to forego certain claims on appeal should serve as cause to excuse any procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012).

In some circumstances, ineffective assistance of counsel may constitute "cause" to excuse a petitioner's procedural default. The United States Supreme Court has carved out a narrow exception that allows a substantial claim of the ineffective assistance of post-conviction counsel to constitute "cause" for underlying claims of ineffective assistance of counsel when the state limits presentation of those claims to post-conviction proceedings or employs a procedural framework that "makes it highly unlikely . . . that a defendant [had] a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (citing *Martinez*, 566 U.S. at 18). This exception applies in Tennessee. *See Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014)). For ineffective assistance of counsel to constitute cause to excuse Petitioner's procedural default of his claims, this Court must find that: (1) the claims of ineffective assistance of trial counsel were "substantial," (2) there was no counsel or counsel was ineffective during the state collateral review, (3) the state collateral review proceeding was the "initial" review proceeding, and (4) the state-law system requires or strongly encourages ineffective-assistance claims to be raised in initial-review collateral proceedings. *Trevino*, 569 U.S. at 423 (citing *Martinez*, 566 U.S. at 13–14, 16–17). The Sixth Circuit has only applied the *Martinez* exception to claims of ineffective assistance of counsel. *See Abdur-Rahman v. Carpenter*, 805 F.3d 710, 714, 716 (6th Cir. 2015).

The *Martinez/Trevino* framework will not excuse any of Petitioner's procedurally defaulted claims. Petitioner's ineffective-assistance-of-counsel claims are defaulted not due to counsel's failure to present claims at the post-conviction level, but rather as a result of

abandoning those claims on appeal. Petitioner did in fact present his ineffective-assistance-of-counsel claims at his initial collateral proceeding, namely his post-conviction hearing, and the post-conviction trial court dismissed the claims, finding that Petitioner knowingly and intelligently waived these claims at his evidentiary hearing, and "there was neither argument, nor any proof, submitted before this Court beyond mere allegation presented by pleading." (Doc. 15-29, at 2403–05.) Petitioner did not then move those claims forward on appeal. Even if Petitioner could demonstrate that, rather than being the result of reasonable, strategic winnowing, the lack of presentation of these ineffective-assistance claims resulted from the ineffective assistance of post-conviction appellate counsel, such a demonstration would not suffice to excuse his procedural default.[15] See *Martinez*, 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings[.]"). As Petitioner has pleaded no other excuse for his procedural default, only the five claims from his first federal habeas petition will be considered on their merits.

### B. Merits

#### i. Cross-examination of Richard Jerger

Petitioner alleges that the trial court unduly limited his cross-examination of co-defendant Richard Jerger regarding Mr. Jerger's prior criminal record and pending criminal charges in violation of his "due process rights, his right to cross-examine witnesses, his right to have a fair trial . . . and right to confront his accusers." (Doc. 1, at 17.) He claims Mr. Jerger's criminal history was pertinent because it could have drawn "a clear picture of the leniency Mr. Jerger"

---

[15] Respondent contends that, in addition to relying on an inappropriate application of *Martinez* to excuse his procedural default, Petitioner's claims are also untimely and do not properly "relate back" in a way that would permit their presentation. (Doc. 21-1.) For the sake of brevity, the Court notes that the claims are procedurally defaulted and that there is no cause to excuse this default, while not taking up the question of whether these claims are timely.

gained through his testimony and evidenced Mr. Jerger's bias or "motive to be particularly cooperative with the government." (*Id.* at 18.) Respondent, however, contends that the state court is granted wide latitude in imposing reasonable limits on cross-examination and that the court's decision to limit cross-examination was not a violation of Petitioner's rights. (Doc. 16, at 12–15.) The Court finds that Petitioner's rights were not violated by the state court's limitation on cross-examination and that Petitioner is not entitled to relief.

At trial, Mr. Jerger, who was charged with the same crimes as Petitioner and the other co-defendants but whose trial was severed, testified for the State. *Lister I*, at *3. On direct-examination, Mr. Jerger was questioned about his lengthy criminal history, which included convictions for aggravated burglary, theft, six auto burglaries, and a conviction for having contraband in a penal facility, escape, and vandalism. (Doc. 15-8, at 103–04.) The State concluded this line of questioning by asking "[h]ave I left anything out," and Mr. Jerger responded in the negative. (*Id.* at 104.) Upon cross-examination, Petitioner's counsel raised Mr. Jerger's pending charges for a "Triple A Package Store robbery in Johnson City," which Mr. Jerger had not mentioned on direct examination, to which Mr. Jerger replied, "I've never been convicted of that." (*Id.* at 141.) Counsel then attempted to clarify, "But you were charged, weren't you?"—and the State objected (*Id.*) The court then conducted a jury-out hearing in which Petitioner's counsel argued that she should be permitted to question Mr. Jerger regarding an outstanding capias for aggravated robbery in Johnson City, Tennessee as such was relevant to his credibility. (*Id.* at 144–45.) However, the trial court ruled that the outstanding warrant was not admissible because there was already information presented regarding both Mr. Jerger's credibility and his lengthy prior history. (*Id.* at 155.)

On delayed direct appeal, the TCCA ruled that, although defendants have the right to offer evidence of a witness's bias, including "regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness," a trial court also has discretion over cross-examination that will not be disturbed "absent a clear abuse of discretion that results in manifest prejudice." *Lister II*, at *17. The TCCA found that co-defendant Jerger "was questioned thoroughly on direct and cross-examination about the fact that he faced the same charges as the other defendants, [the fact] that the State had not promised him anything in exchange for his testimony, and his motivations for testifying at trial." *Id.* at *18–*19. It noted that the jury was also "made aware" that Mr. Jerger was involved in an aggravated robbery, that he had a lengthy criminal history, and that he had repeatedly lied to police in this very case. *Id.* at *19. Finally, the court noted that the pending charges were in a different district, which, under Tennessee precedent, indicated that they had "little relevance as a source of potential bias." *Id.* The TCCA held that the trial court accordingly did not abuse its discretion. *Id.*

The Sixth Amendment right to confront witnesses includes the "right to effectively cross-examine adverse witnesses, including through 'the exposure of a witness'[s] motivation in testifying.'" *Rogers v. Kerns*, 485 F. App'x 24, 28 (6th Cir. 2012) (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (internal citations omitted). However, "trial judges retain wide latitude . . . to impose reasonable limits," on cross-examination to prevent "harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). To demonstrate that cross-examination was unreasonably limited, Petitioner must show "that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness," from which the jury could have appropriately drawn inferences

about the witness's reliability, *Davis*, 415 U.S. at 318, which includes facts about the "witness's

own inconsistent statements," "the witness's criminal history or status as a parolee or

probationer, any immunity or plea deals between the witness and the state, and other 'prejudice,

or ulterior motives,'" *United States v. Givhan*, 740 F. App'x 458, 461 (6th Cir. 2018) (citing

*Blackston v. Rapelje*, 780 F.3d 340, 349 (6th Cir. 2015)).  Limitations do not violate Petitioner's

Sixth Amendment rights "so long as cross-examination elicits adequate information to allow a

jury to assess a witness's credibility, motives, or possible bias." *Id*.

To determine if the trial court's limitation violates the Confrontation Clause, the Court

applies a two-part test analyzing first, whether, despite the limitation, the jury had sufficient

information to evaluate the witness's bias or motive and second, if it did not, the Court balances

"the violation against the competing interests at stake[.]" *Lewis v. Wilkinson*, 307 F.3d 413, 421

(6th Cir. 2002) (quoting *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000)).  The State's

competing interests include preventing "minitrials on collateral issues," the probative value or

prejudicial nature of the evidence, and the extent to which the defendant was actually permitted

to cross-examine the witness.  *Jordan v. Warden, Lebanon Correctional Inst.*, 675 F.3d 586, 595

(6th Cir. 2012).  If the court improperly restricted Petitioner's ability to impeach the witness, the

Court determines whether the restriction was harmless error by analyzing factors like "the

importance of the witness' testimony in the prosecution's case, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the testimony of

the witness on material points, the extent of cross-examination otherwise permitted, and, of

course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

The state court's holding was neither an unreasonable application of or contrary to

federal law.  While the court did limit Petitioner's ability to cross-examine Mr. Jerger regarding

his pending charges in a different judicial district, which is a prototypical form of bias, the jury had ample other information from which to discern Mr. Jerger's motive or to undermine his credibility. The jury was presented with information about Mr. Jerger's criminal background, his inconsistent statements to the police along with the questionable timing of those statements, the fact that Mr. Jerger was faced with the same charges as the other co-defendants, and that there could be consideration of his testimony in his own sentencing. *See Brown v. Curtin*, 661 F. App'x 398, 406 (6th Cir. 2016) (holding that a limitation on cross-examination regarding pending charges did not violate the Confrontation Clause where cross-examination undercut the witness's testimony in other ways and the prosecution had a "strong case" against the petitioner). Even if Petitioner could prove that the limitation was unconstitutional, any error was harmless. Mr. Jerger's testimony was certainly not central to the prosecution's case, as he was neither a totally impartial witness nor an eyewitness to the events that occurred in the hotel room. There was significant evidence, from more reliable sources, tending to corroborate Mr. Jerger's testimony, particularly to show that there was no "plea deal" offered to Mr. Jerger. Extensive cross-examination was permitted, and the prosecution's case against Petitioner, even without Mr. Jerger's testimony, was strong. In sum, the Court cannot find that the state court's holding was an unreasonable application of federal law.

### ii. Petitioner's Recorded Statement

Petitioner claims that the trial court erred by failing to suppress his recorded statement, when the "original recording" of that statement was intentionally destroyed by a detective involved in this case. (Doc. 1, at 19.) Respondent claims that Petitioner is not entitled to relief when the recording of his statement was preserved on a computer hard drive and disclosed prior to its admission at trial, regardless of what happened to a "burned" compact disc copy of the

statement. (Doc. 16, at 15–16.) The Court finds that Petitioner is not entitled to relief where Petitioner's original recorded statement was preserved and provided.

Approximately one month prior to trial, the state provided audio recordings to Petitioner in response to a motion to compel discovery. *Lister II,* at *6–*7. These recordings included several witness statements, including one made by Petitioner, given to Detective Duff Brumley on the night of the shooting. *Id.* at *7. Detective Brumley testified that he recorded these conversations on a digital recorder and then uploaded them to his work computer and "burned" copies onto compact discs ("CDs") which he provided to an assistant district attorney. *Id.* After the motion to compel discovery, he made additional copies which he provided to counsel for all defendants. *Id.* Thereafter, Petitioner filed a motion to suppress his statement because the recordings had not been provided in a "timely fashion." *Id.* At a hearing on Petitioner's motion, Officer Felton testified that on the night of the shooting, Detective Brumley gave the CDs of the statements to another detective, which, at some point, ended up on Officer Felton's desk without his knowledge. *Id.* at *7–*8. Officer Felton stated that after Detective Brumley's testimony at a previous hearing, he searched his desk and found the CDs, but, because he was embarrassed for not realizing he had them, he threw them away in a dumpster. *Id.* at *8. The court denied Petitioner's suppression motion. *Id.* At trial, Officer Felton testified regarding his destruction of the CDs and noted that, as a result of his actions, he had been demoted from detective to patrol officer. *Id.* at *9.

On delayed direct appeal, the TCCA applied state law, which holds that the State must provide defendant with exculpatory evidence and when such evidence has been lost or destroyed, the courts must determine whether "a trial conducted without the missing evidence would be fundamentally fair." *Id.* at *13 (internal punctuation omitted). The TCCA found that the CDs

destroyed by Officer Felton were merely copies, that the original statements were preserved, and that all defendants were provided with copies prior to trial. *Id.* at *14. Thus, the court determined that Petitioner was not entitled to relief, "because the trial was not conducted without the missing evidence." *Id.*

The State's failure to preserve evidence can constitute denial of due process of law where a defendant can show that the state acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "In order to prove a violation of due process under this standard, a defendant must show 1) bad faith on the part of the police, 2) that the exculpatory value of the evidence was apparent before its destruction, and 3) that the defendant would be unable to obtain comparable evidence by any other reasonably available means." *Wilson v. Sheldon*, 874 F.3d 470, 479 (6th Cir. 2017) (citing *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996)). The test applied in Tennessee courts regarding failure to preserve evidence was intended to enhance protections for defendants and thus lowers the burden for proving that the state has breached its duty to preserve evidence. *Macfarlane v. Westbrooks*, No. 3:13-cv-828, 2013 U.S. Dist. LEXIS 165050, at *38 (M.D. Tenn. Nov. 20, 2013).

Here, the state court's holding relied not only on its interpretation of the law, but also a factual finding that the original recording was, in fact, preserved. The original recording was taken on the interviewing detective's recording device and then uploaded to the hard drive of his computer. There is no evidence that the original recordings were destroyed, and, although Petitioner indicates that there was a risk of the recordings being altered, he makes no suggestion, and offers no evidence, that they were altered. There is no evidence rebutting this factual finding, and, parallel to the Tennessee test, Petitioner is not entitled to relief based on the failure to preserve evidence when the original source of the evidence in question was preserved and the

evidence was available prior to trial. Even if this Court determined that the destruction of the CDs was a violation, Petitioner is not entitled to relief because he was reasonably able to obtain comparable evidence, namely another copy of his recorded statement. The Court cannot find that the state-court holding relied on an unreasonable factual finding or was contrary to or an unreasonable application of federal law. Petitioner is not entitled to relief.

### iii. Officer Kevin Felton's Statement

Petitioner alleges that the trial court erred in not ordering the State to produce a statement Officer Felton made in the course of an investigation by the Tennessee Bureau of Investigation ("TBI"), regarding the destruction of the CDs described above. (Doc. 1, at 20.) Respondent retorts that, as a state-law claim, this is not a cognizable ground for habeas relief and that any attempt by Petitioner to now present this under a federal theory would render the claim procedurally defaulted. (Doc. 16, at 16.) The Court finds that this is not a cognizable ground and Petitioner is not entitled to relief.

At trial, after the State's direct examination of Officer Felton, co-defendant Kincaid's counsel requested that the State produce statements by Officer Felton relating to his destruction of the CDs, alleged to have been taken pursuant to an investigation by the TBI. (Doc. 15- 6, at 120–22.) Prior to her cross-examination, Petitioner's counsel likewise requested "the sworn statements that [Officer Felton had] given in regards to evidence that was thrown away," which she alleged were *Jencks* material and thus required to be produced. (*Id.* at 135.) The State contended that "[it did not] have them and they're still—those are privileged and not part of this matter," and then argued that, as TBI files, any statements are totally and completely privileged, with no exceptions. (*Id.* at 120–22.) The court denied both requests, holding that the State was not required to produce any such statements because they would have nothing to do with the

facts of this case.  (*Id.*)  The defendants were, however, allowed to cross-examine Officer Felton regarding his destruction of the CDs and his demotion.  (*Id.*)

In his appellate brief on delayed direct appeal, Petitioner challenged the state court's denial of these alleged statements under Tennessee Rule of Criminal Procedure 26.2 and noted that trial counsel requested the materials under *Jencks*.  (Doc. 15-23, at 16.)  He argued that Officer Felton had given a sworn statement during a TBI investigation that should have been discoverable and was pertinent to cross-examination as it went to his credibility.  (*Id.*)  Petitioner likewise cited to cases which discussed the federal *Jencks* rule and which internally cited to federal cases from non-binding federal jurisdictions.  (*Id.*)  The TCCA ruled that this issue had no merit because there was no evidence in the record, outside of claims by Petitioner's counsel and counsel for co-defendant Kincaid, for it to determine that the alleged statements existed or contained relevant information.  *Lister II,* at *15.

In his reply brief to this Court, Petitioner addressed the State's challenge to the exhaustion or procedural default of this claim by arguing that Tennessee Rule of Criminal Procedure 26.2 was "promulgated by the Tennessee General Assembly to meet constitutional mandates set by the Supreme Court of the United States" and that the wording of this rule is substantially similar to its federal counterpart, namely the *Jencks* Act, which he claims indicates that Petitioner properly exhausted this claim.  (Doc. 17, at 12.)  Whether this claim is procedurally defaulted is a complex question, and the Court will instead choose to deny this claim on its merits, as permitted by *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

Petitioner is not entitled to relief on this claim, because it is not cognizable on habeas relief.  *Jencks* violations may refer to *Jencks v. United States*, 353 U.S. 657 (1957) or violations of 18 U.S.C. §3500, the codified "Jencks Act."  However, even if the Court considers

Petitioner's claim properly raised under either federal *Jencks* rule, each is an evidentiary rule applicable to the federal courts and is not a matter of constitutional law sufficient to warrant habeas relief. *See* 18 U.S.C. §3500(a) (clarifying that the evidentiary rules encompassed apply "in any criminal prosecution brought by the United States"); *Pearison v. Carlton*, No. 1:05-cv-149, 2006 U.S. Dist. LEXIS 72055, at *23 (E.D. Tenn. Sept. 29, 2006) (holding that *Jencks v. United States* applies only to federal prosecutions); *see also Bogan v. Bradt*, No. 11-CV-1550, 2017 U.S. Dist. LEXIS 105294, at * (E.D.NY. July 6, 2017) (detailing Second Circuit precedent that the *Jencks* rule has not been held to be a constitutional mandate and thus is not a ground for habeas relief). If Petitioner challenges the denial of the statement under Tennessee's state law parallel to the *Jencks* act, such would be a purely state-law evidentiary claim which is likewise not cognizable. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding "a federal court may not issue the writ on the basis of a perceived error of state law). This claim is then not cognizable and Petitioner is not entitled to relief.

### iv.    Sufficiency of the Evidence

Petitioner challenges the sufficiency of the evidence to support each of his convictions, specifically arguing that his conviction for first-degree murder was improperly supported where the verdicts between co-defendants were inconsistent. (Doc. 1, at 21.) Petitioner contends that, because the jury hung on the issue of self-defense regarding the first-degree murder charge of co-defendant Tony Kincaid, who was the shooter in this case, no rational juror could have found him guilty of first-degree felony murder. (Doc. 1, at 21.) Respondent answers that Petitioner essentially challenges "the credibility of the proof presented and the inferences drawn therefrom," which are issues for the jury and that the evidence is otherwise sufficient (Doc. 16, at

16–18.)  The Court finds that the TCCA's holding that the evidence was sufficient to support each of Petitioner's convictions was not unreasonable.

On direct appeal, the TCCA noted with respect to Petitioner's felony-murder convictions that, under Tennessee law, felony murder is defined as "a killing of another committed in the perpetration of or attempt to perpetrate . . . robbery." *Lister I*, at \*52.  It then recognized evidence that, after taking steps to orchestrate the robbery, Petitioner, along with Tony Kincaid, entered the hotel room with the intent to rob Mr. Shapley and Mr. Villalobos and, during an ensuing struggle, Mr. Kincaid shot Mr. Shapley, who died from the bullet wound.  *Id.*  The court specifically noted that there need not be rational consistency between the verdicts of co-defendants.  *Id.*

As to Petitioner's attempted aggravated-robbery charge, Tennessee law defines aggravated robbery as the "intentional knowing theft of property from the person of another by violence or putting the person in fear" "[a]ccomplished with a deadly weapon" or "[w]here the victim suffers serious bodily injury."  *Id.* at \*53 (citing Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1), (2) (2003)).  Criminal attempt is defined as acting "with intent to complete a course of action or cause a result that would constitute the offense, . . . and the conduct constitutes a substantial step toward the commission of the offense."  *Id.* (citing Tenn. Code Ann. § 39-12-101(a)(3) (2003)).  The TCCA found that Petitioner told Mr. Shapley and Mr. Villalobos that he was there to rob them, drew a loaded gun on them, and demanded their money.  *Id.* at \*53–\*54.  The court noted that, although he did not take any money from the victims and did not shoot the victim, he told co-defendant Kincaid to shoot Mr. Villalobos.  *Id.* at \*54.  It then held that Petitioner was not entitled to relief because, although he claimed that "only a fight occurred," the jury's verdict indicated that the jurors rejected this claim.  *Id.*

The court then discussed Petitioner's convictions for conspiracy to commit aggravated robbery. It elaborated that, to convict a defendant of conspiracy to commit aggravated robbery under Tennessee Code Annotated § 39-12-103, the jury must find:

> (1) that the defendant entered into an agreement with at least one other person to commit aggravated robbery, (2) that each of the parties to the conspiracy had the intent to commit the offense of aggravated robbery, (3) that each party acting for the purpose of promoting or facilitating the aggravated robbery had agreed that one or more of them would engage in the conduct constituting the offense of aggravated robbery, and (4) that one of the parties to the conspiracy committed an overt act in furtherance of the conspiracy.

*Id.* at *54–*55. The court then found that Petitioner had discussed his plan to rob Mr. Villalobos and Mr. Shapley, whom he believed would be unarmed but in possession of either money or drugs, with others. *Id.* at *55. He then, along with his co-defendants, searched for others to join in on the robbery, obtained weapons and ammunition, and made a plan for carrying out the robbery. *Id.* The court then held that Petitioner is not entitled to relief on this claim. *Id.*

To evaluate challenges to the sufficiency of the evidence, federal courts sitting in habeas review analyze "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Courts look to the evidence supporting the conviction with specific reference to the elements of the crime as established by state law. *Id.* at 324 n.16. However, because the trier of fact is charged with, and in the best position for, resolving conflicts in testimony, weighing the evidence, and drawing inferences, its verdict will be given deference. *Id.* at 319. Challenges to the sufficiency of the evidence are incredibly difficult due to the double layer of deference granted to these claims. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Not only is the trier of fact's verdict given

deference as detailed above, but, under AEDPA, federal courts are tasked with deference to state appellate courts' consideration of the verdict. *Id.*

Considered in the light most favorable to the State, the evidence adduced at trial demonstrated that Petitioner, along with his co-defendants, spent more than twenty-four hours orchestrating a robbery of the two victims, whom Petitioner knew to be traveling together and believed to be unarmed and thus unable to defend themselves against such an attack. Petitioner and his co-defendants ascertained the location of the victims, enlisted the help of a prostitute, and formulated a plan to rob the victims for either drugs or money. The group obtained weapons and ammunition and drove to the hotel where the victims were staying, whereupon Petitioner entered the hotel room and announced his intention to rob the victims. A fight ensued, and Mr. Shapley was shot. Then, Petitioner and co-defendant Kincaid left the room, and Mr. Shapley succumbed to his injury. This evidence is sufficient to demonstrate that Petitioner, along with his co-defendants, formed a joint plan and took substantial steps towards executing that plan to rob the victims and that a killing of another happened during the commission of that felony. As to Petitioner's contention that the verdicts are inconsistent, the Court notes that even if such were true, this would not entitle Petitioner to habeas relief where "[t]he Supreme Court has repeatedly held that a jury may announce logically inconsistent verdicts in a criminal case." *United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009) (quoting *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990)); *see also Longwell v. Arnold*, 371 F. App'x 582, 589 (6th Cir. 2010) (holding that potentially inconsistent verdicts between co-defendants did not render the evidence insufficient).

### v.  Cumulative Error

Petitioner argues that the cumulative impact of the errors or misconduct committed by the State denied him a fair trial.  (Doc. 1, at 22–26.)  Specifically, he argues that Officer Felton's destruction of the recorded discs of Petitioner's statement was attributable to the State, that the Attorney General's office withheld the criminal history of co-defendant Jerger, and that the state knowingly allowed Mr. Jerger to provide false testimony regarding a plea agreement with the State.  (*Id.*)  The State argues that this claim is not cognizable on habeas relief.  (Doc. 16, at 19.)  The Court agrees.  Because "the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief," this is not a cognizable ground for habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (holding "not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief").

## IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus (Doc.  1) will be **DENIED,** and this action will be **DISMISSED**.

## V.  CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and

that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists would not disagree that Petitioner's right to confrontation was not violated, that the trial court did not err in refusing to suppress his recorded statement, that the evidence was sufficient to support his convictions, or that his other claims were not cognizable grounds for habeas relief. Accordingly, a **COA SHALL NOT ISSUE.**

**AN APPROPRIATE JUDGMENT WILL ENTER.**


*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**